**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. [UNDER SEAL] <br>        *Plaintiffs*, <br> v. <br>  [UNDER SEAL] <br>        *Defendants*. | **Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)** <br><br> **Jury Trial Demanded** |

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERNDISTRICT OF LOUISIANA
LAKE CHARLES DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.* ARIAN HAXHILLARI<br>  2114 Fortuna Bella Drive<br>  Pearland, Texas 77581<br>  *Plaintiffs*,<br><br>v.<br><br>SOUND PHYSICIANS<br>  524 Doctor Michael Debakey Dr<br>  Lake Charles, Louisiana 70601<br><br>  *Serve Registered Agent:*<br>    Corporation Service Company<br>    501 Louisiana Avenue<br>    Baton Rouge, Louisiana 70802<br><br>DR. RAY FLETCHER<br>  362 Gaston Avenue<br>  Fairhope, Alabama 36532<br><br>DR. THOMAS KAZECKI<br>  5124 E. Worthington Drive<br>  Lake Charles, Louisiana 70605<br><br>DR. LAUREN JACOBY<br>  4101 Locke Lane<br>  Lake Charles, Louisiana 70605<br><br>DR. HUNG NGUYEN<br>  2810 Saint Francis Forest Drive<br>  Lake Charles, Louisiana 70605<br>  *Defendants.* | **Case No. 21-3510**<br><br>**Complaint for Violations of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.***<br>**FILED UNDER SEAL pursuant to 31 U.S.C. § 3730(b)(2)**<br><br>**Jury Trial Demanded** |

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

## INTRODUCTION

1.

*Qui tam* Relator Dr. Arian Haxhillari ("Dr. Haxhillari" or "Relator"), by his attorneys, individually, and on behalf of the United States of America files this Complaint against Sound Physicians ("Sound"), Dr. Ray Fletcher, Dr. Thomas Kazecki, Dr. Lauren Jacoby, and Dr. Hung Nguyen (collectively, "Defendants") to recover damages penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*  ("FCA" or "False Claims Act").

2.

Additionally, Relator Haxhillari brings claims on behalf of himself for unlawful retaliation pursuant to 31 U.S.C. § 3730(h).

3.

Defendants defraud the U.S. Government and the State of Louisiana by overbilling the Medicare and Medicaid programs. They do this by artificially inflating care codes in order to increase the Relative Value Units of physicians and consequently increasing reimbursements from the Centers for Medicare and Medicaid Services ("CMS").

4.

Defendant Sound's compensation structure incentivizes physicians who reach the level of junior partner to bill at a higher rate of productivity than other physicians.

5.

As a result, the junior physicians at Sound upcode hospital observation and subsequent care codes, falsely representing that they are performing critical care on patients. This results in

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 3 -

consistent and significant overpayments from CMS.

6.

As a direct, proximate, and foreseeable result of the Defendants' fraudulent course of conduct, Defendants have submitted, or caused to be submitted, false and fraudulent claims to Medicare and Medicaid and violated the federal False Claims Act.

**JURISDICTION AND VENUE**

7.

This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732(a)-(b).

8.

Dr. Haxhillari's federal cause of action for unlawful retaliation is authorized by 31 U.S.C. § 3730(h).

9.

This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants Sound Physicians and Fletcher conducts business in this judicial district and individual defendants Kazecki, Jacoby, and Nguyen reside in this judicial district.

10.

Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the complained of illegal acts occurred within this judicial district.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 4 -

## THE PARTIES

### I.   Defendant

11.

Sound Physicians ("Sound") is a third-party hospitalist service provider that operates nationwide. It was founded by Robert Bessler, MD in 2001 and is headquartered in Tacoma, Washington. Sound has locations dispersed throughout the country, including one located at 524 Doctor Michael Debakey Drive, Lake Charles, Louisiana 70601.

12.

Sound provides services in over 180 hospitals in 35 states with more than 1,750 providers, including physicians and advanced care practitioners.

13.

Sound is a physician-founded and led organization providing services across the acute episode of care – through emergency medicine, critical care, hospital medicine, population health, telemedicine and physician advisory services. *See generally* https://soundphysicians.com/what-we-do/.

14.

As a hospitalist service provider, Sound helps staff hospitals and operates within the following service lines: Emergency Medicine, Critical Care, Hospital Medicine, Anesthesia, Population Health, Telemedicine, and Advisory Services.

15.

Sound's Lake Charles location primarily staffs Christus Ochsner St. Patrick Hospital, which is located at 524 Dr. Michael Debakey Drive, Lake Charles, Louisiana 70601.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 5 -

16.

Christus Ochsner St. Patrick Hospital is a rural facility and serves a population that is 80% geriatric. Most of its patients have Medicare and/or Medicaid insurance.

17.

Dr. Vinitha Kumar is the regional CEO of Sound covering the state of Louisiana. Her region includes programs from Florida to New Mexico.

18.

Dr. Ray Fletcher is the Regional Medical Director at Sound's Lake Charles location.

19.

Tonya Jenkins is the Regional Finance Officer for Sound and is based in the Lake Charles location.

20.

Dr. Thomas Kazecki is a junior partner at Sound.

21.

Dr. Hung Nguyen is a junior partner at Sound.

22.

Dr. Lauren Jacoby is a junior partner at Sound. She is also interim Chief of the program.

23.

Dr. Vinitha Kumar is the Gulf Division CEO for Sound.

## II.    Relator Dr. Arian Haxhillari

24.

Dr. Haxhillari was born in Albania and earned a physician's license there in 1992.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 6 -

25.

Dr. Haxhillari immigrated to Houston, Texas in or around October 1995. He is a citizen of the United States and resides at 2114 Fortuna Bella Drive, Pearland, Texas 77581.

26.

Dr. Haxhillari became Board Certified by the American Board of Medical Specialties in May 2007. He was recertified in May 2021.

27.

In March 2015, Dr. Haxhillari began working at Sound's Lake Charles, Louisiana location.

28.

Dr. Haxhillari was the Chief and Medical Director of the program at Sound. He was hired with a goal to build up the team of physicians at Sound. He contributed to hiring decisions, conducted internal billing audits, and reviewed productivity metrics to ensure the quality of the care administered by Sound.

29.

Dr. Haxhillari's other responsibilities including administrative duties, scheduling, performance reviews, being a liaison with hospital staff, and helping address any issues between the hospital and the physicians at Sound.

30.

When Dr. Haxhillari started, there were only two other full-time physicians and eight locum (temporary) physicians working with Sound. As of June 2021, there are thirteen full time physicians and two Nurse Practitioners working with Sound at the Lake Charles location.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 7 -

31.

In addition to his administrative duties, Dr. Haxhillari provided medical services as a Sound physician. However, because of his position, he saw fewer patients than any other physician at Sound during his tenure.

32.

Dr. Haxhillari's contract with Sound ended June 25, 2021.

## THE LAW

**I.    The False Claims Act**

33.

During all times relevant to the facts of this case, the federal False Claims Act provided in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 Note; Public Law 104-410),[1] plus three times the amount of damages which the Government sustains because of the act of that person.
>
> * * * *
>
> (b) . . . For purposes of this section (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate

---

[1] Civil penalties increase to up to $21,563 per false claim for claims submitted to the Government after November 2, 2016 and including treble damages. 28 C.F.R. § 85.5.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud; (2) the term "claim" (A) means any request or demand, whether under contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; . . . (3) the term "obligation" means an established duty, whether or not fixed, arising from an expressed or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and (4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

31 U.S.C. § 3729 (2009).

## II.        Federally Funded Health Care Programs and Regulations

### A.        Medicare

34.

In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. § 1395 *et seq.* ("The Medicare Program" or "Medicare") authorizing the federal government to pay for the cost of certain medical services for persons aged 65 and older.

35.

The United States, through the Department of Health and Human Services ("HHS"), administers the Medicare program.  Medicare is a federally subsidized health insurance system for disabled persons, blind persons, people with End Stage Renal Disease, or persons who are 65

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 9 -

or older. Medicare includes Part A (Hospital Insurance) and Part B (Medical Insurance).

36.

Part A of the Medicare program offers eligible beneficiaries Part A hospital insurance. Medicare Part A helps cover inpatient care in hospitals, skilled nursing facility care, nursing home care, hospice care, and home health care.

37.

If a patient is admitted into the hospital following an ER visit, on a doctors order, and stays in the hospital for two midnights or longer, Medicare Part A pays for the inpatient hospital stay plus the outpatient costs from the ER Visit. *See Are you a Hospital Inpatient or Outpatient?*, CMS (Aug.2018), https://www.medicare.gov/Pubs/pdf/11435-are-you-an-inpatient-or-outpatient.pdf.

38.

Generally, under Part A beneficiaries pay a one-time deductible for their inpatient hospital services for the first 60 days they are in the hospital. *See id.* If a patient is not admitted into the hospital as an inpatient, Medicare Part B generally covers the rest of the costs.

39.

Part B of the Medicare Program offers eligible persons aged 65 and older to obtain benefits in return for payments of monthly premiums as established by HHS.  Part B covers, in general, 80% of reasonably charged services and items other than hospital expenses, and 100% of clinical diagnostic services.

40.

HHS has delegated the administration of the Medicare Part B Program to its component

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 10 -

agency, the Health Care Financing Administration ("HCFA").

41.

Medicare reimbursement to providers of medical services is accomplished through private insurance carriers ("carriers"), as provided by 42 U.S.C. § 1395u.  The carrier, on behalf of the Medicare Program, reviews and approves claims submitted for reimbursements by Medicare providers.

42.

The carrier makes payment on those claims which appear to be eligible for reimbursement under Medicare Part B on behalf of the United States. 42 U.S.C. § 1395u(a). Claims may be made by the beneficiaries or by providers who have received assignment from beneficiaries to make claims on their behalf. *See* 42 U.S.C. §§1395u(b)(3)(B). HHS, through HCFA, has issued the HCFA Carriers Manual ("Manual"), which is a guideline and explanation of the Medicare statute and its regulations.

43.

Before accepting Medicare assignments, Sound, and all providers who submit claims for services provided to Medicare beneficiaries, must certify that it will operate in accordance with the requirements established by the Secretary of the Department of Health and Human Services.

44.

At all times herein mentioned, Sound had knowledge of the public policies expressed in the laws and regulations herein mentioned and of the fact that it must comply with all applicable Federal laws in order for the services Sound performs to be approved for coverage under Medicare.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 11 -

45.

The Medicare program (both Part A and Part B) is also administered by private healthcare insurers known as Medicare Administrative Contractors ("MACs").

46.

MACs are awarded geographic jurisdiction to process Medicare claims for beneficiaries.

47.

MACs are also responsible for establishing local coverage determinations ("LCDs").

48.

An LCD is a decision made by a MAC on whether a particular service or item is reasonable and necessary, and therefore covered by Medicare within the specific region that the MAC oversees.

49.

CMS is responsible for publishing National Coverage Determinations ("NCDs"). An NCD is a decision made by CMS on whether a particular service or item is reasonable and necessary, and therefore covered by Medicare anywhere in the United States.

III.   **State Funded Health Care Programs and Regulations**

   A. **Medicaid**

50.

In 1965, Congress enacted Title XIX of the Social Security Act under 42 U.S.C. § 1396 *et seq.* ("The Medicaid Program" or "Medicaid"). Under the program, the federal government provides matching funds to states to enable them to provide medical assistance to residents who meet certain eligibility requirements. The objective is to help states provide medical assistance to

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 12 -

residents whose incomes and resources are insufficient to meet the costs of necessary medical services.

51.

Medicaid serves as the nation's primary source of health insurance coverage for low-income populations, providing coverage to over sixty-five million people. All states, the District of Columbia, and the U.S. territories have Medicaid programs.

52.

States that participate in the Medicaid Program administer their own Medicaid program. *See* 42 U.S.C. § 1396a. The states establish eligibility standards, the scope and types of services covered, and the rate of payment.

53.

State administrators must comply with federal Medicaid laws, which have certain requirements for service delivery, quality, funding and eligibility.

54.

The United States, through CMS, monitors the state-run Medicaid programs.

55.

The federal government pays a share of each state's Medicaid expenditures. The federal medical assistance percentage ("FMAP") calculation determines the amount of federal reimbursement for each state's Medicaid expenditures. FMAP is calculated using the per capita income amounts of the state relative to total U.S. per capita income.

56.

The FMAP formula is designed so that the federal government pays a larger portion of

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 13 -

Medicaid costs in states with lower per capita incomes relative to the national average.

57.

Louisiana's FMAP is 74.22%.

58.

The Patient Protection and Affordable Care Act extended Medicaid eligibility to all adults under the age of 65 with incomes below 138% of the federal poverty level.

59.

The Supreme Court's ruling in *National Federation of Independent Business v. Sebelius* effectively made the expansion optional for states. *See* 567 U.S. 519 (2012).

60.

As of 2020, 36 states, including Louisiana, and the District of Columbia have chosen to adopt the adult expansion.

61.

In Louisiana, the Medicaid program is administered by the Louisiana Department of Health.

62.

Nearly 1.8 million individuals are enrolled in Louisiana's Medicaid program.

**IV.    Relative Value Units**

63.

Relative Value Units ("RVUs") is a metric used to determine physician productivity by assigning the complexity of procedures performed by physicians.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT<br>*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

64.

To measure an RVU, the level of physician labor is assessed on three levels: (1) pre-service work, (2) intra-service work, and (3) post-services work.

65.

Most medical facilities use this data to measure how productive their physicians are, and this measurement helps calculate the proper fees to pay the physician for the services they are providing.

66.

Typically, RVU bonuses and compensation is based on two main factors: the number of patients seen, and the critical care or severity of care provided. For example, if a physician is seeing a high number of patients with severe conditions, they can earn the maximum in RVU payments.

67.

RVUs only provide an indication of physician productivity when billing procedures that have a CPT code. Therefore, any services provided by a physician that are not billable by CPT code are not factored into that physicians' productivity.

68.

RVUs are also not always an indication of how productive a physician has been if CMS requires the bundling of services. This allows CMS to lower its reimbursement, but then informs the employer that the physician has done 50% less work, which is incorrect.

69.

While it is appropriate to measure physician productivity using RVUs, it is not

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 15 -

appropriate to use RVUs as a measure of billing submitted to CMS.

## V.    Coding

70.

Current Procedural Terminology ("CPT") codes were developed by the American Medical Association ("AMA") as a system to provide a standard language and numerical coding methodology to accurately communicate the medical, surgical, diagnostic, and therapeutic services provided by qualified healthcare professionals.

71.

CPT codes are a standardized coding system by which medical services and procedures are memorialized and assigned value for reimbursement by CMS.

72.

CPT Category 1 codes are subdivided into six categories: Evaluation & Management Services (99202 – 99499); Anesthesia Services (01000 – 01999); Surgery (10021 – 69990); Radiology Services (70010 – 79999); Pathology and Laboratory Services (80047 – 89398); Medical Services and Procedures (90281 – 99607).

73.

Within the above categories, CPT codes are ranges of sequential codes corresponding to a gradient, or escalation, of similar medical services or procedures. For example, the higher a code in a series, the more critical the care provided by the physician.

74.

All the coding series referenced below are hospital admission follow up codes. As such, when referring to the codes in a particular series, physicians occasionally use the terms "F-1,"

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 16 -

"F-2", and "F-3," where "F" stands for "follow up" and the number corresponds to the complexity of services provided with 1 being the lowest complexity and 3 being the highest.

75.

CPT codes 99218, 99219, and 99220 are defined as "Hospital Observation Services". They are distinguished by an increase in the complexity, severity, or intensity inherent to the nature of the hospital observation service. *See United HealthCare Oxford Reimbursement Policy*, https://www.oxhp.com/secure/policy/observation_care_evaluation_and_management_codes.pdf; Dotson, P. (2013). *CPT Codes: What Are They, Why Are They Necessary, and How Are They Developed,* US NATIONAL LIBRARY OF MEDICINE NATIONAL INSTITUTES OF HEALTH, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3865623/pdf/wound.2013.0483.pdf; *CPT Overview and Code Approval*, AMA, https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval; *Criteria for CPT Category II Codes*, AMA, https://www.ama-assn.org/practice-management/cpt/criteria-cpt-category-ii-codes; *see also What is CPT?*, AAPC, https://www.aapc.com/resources/medical-coding/cpt.aspx.

76.

CPT code 99219 is the second highest complexity code for its Hospital Observation Visits series. To meet the requirements to bill for 99219, physicians must meet the three components below:

    a.  A comprehensive history

    b.  A comprehensive exam

    c.  Medical decision making of moderate complexity. *See United HealthCare,* at 3; *See* also *Current Procedural Terminology (CPT) Professional Edition, AMA*

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 17 -

*(2018)*.

77.

To properly bill for CPT code 99219, physicians must also typically spend 50 minutes at the patient's bedside and on the patient's hospital floor or unit and the patient must have a problem or problems of moderate severity requiring admission. *See United HealthCare. at 3; See also Current Procedural Terminology (CPT) Professional Edition.*

78.

In contrast, CPT code 99218 requires medical decision making of low complexity, problem or problems of low severity, and a time requirement of 30 minutes. *See United HealthCare, at 3; See also Current Procedural Terminology (CPT) Professional Edition.*

79.

CPT Code 99220 is the highest complexity code for the Hospital Observation Visit series. To meet the requirements to bill for 99220, physicians must meet the three components below:

    a. A comprehensive history

    b. A comprehensive examination

    c. Medical decision making of high complexity. See *United HealthCare. at 3*; See also *Current Procedural Terminology (CPT) Professional Edition*.

80.

In order to properly bill for CPT code 99220, physicians must also typically spend 70 minutes at the patient's bedside and on the patient's hospital floor or unit and the patient must have a problem or problems of high severity. *See United HealthCare, at 3*.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 18 -

81.

Medical decision making of high complexity could include counseling and/or coordination of care with other physicians, other qualified healthcare professionals, or agencies consistent with the nature of the problem or problems and the patient's needs. *See United HealthCare, at 3.*

82.

CPT code series 99221, 99222, and 99223 are defined as "Initial Hospital Care" codes.

83.

CPT code 99223 is the highest complexity code for Initial Hospital Care. To meet the requirements to bill for 99223 (over 99221 or 99222), a physician must meet all three components below

    a.   A comprehensive history

    b.   A comprehensive examination

    c.   Medical decision making of high complexity

84.

Other elements of CPT codes 99223 include providing counseling and coordination of care with other providers consistent with the nature of the problem. Typically, the medical problem should be highly severe in order to warrant admission. And to bill either of the above codes, the physician would need to spend 70 minutes with the patient. As discussed in the examples below, this rarely occurs at Sound.

85.

CPT code series 99224, 99225, and 99226 are defined as "Subsequent Observation Care"

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 19 -

codes.

86.

CPT code series 99231, 99232, and 9233 are defined as "Subsequent Hospital Care"

codes.

## FACTUAL ALLEGATIONS

### I.   Sound Compensation structure

87.

When a physician becomes a partner at Sound, Dr. Haxhillari would immediately see a

change in that physician's RVUs. The partner physicians would immediately start upcoding to

increase their productivity score and therefore, increase their compensation. This practice also

resulted in drastic overbilling to CMS.

88.

Partner physicians at Sound are paid under a tiered compensation structure. They earn a

base hourly rate, a productivity bonus based on RVU levels, a team bonus, and quality bonuses.

Non-partner physicians do not receive a productivity bonus based on their RVU and productivity

levels until after they have been employed for four months.

89.

Physicians are evaluated on their RVUs from their first day at Sound, however, they are

not eligible to receive bonuses based on their productivity until after four months of

employment. At the Lake Charles location, in order to begin receiving bonuses based on RVUs,

physicians must meet a threshold of at least 16.9 RVUs per day shift or 7.9 RVUs per night shift.

On the night shift, a physician can earn more RVUs in less time due to the shift calculation.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 20 -

90.

According to Dr. Haxhillari, the threshold at which physicians are eligible to receive RVU bonuses varies per Sound facility.

91.

After four months, if the physician is meeting the minimum thresholds, a non-partner physician can start receiving a 25% bonus based on their RVU levels. For example, if a physician is completing 16.9 RVUs per shift with approximately 8 encounters per shift, they are earning 2.1 RVU points per encounter and would then be meeting their thresholds to receive the 25% bonus.

92.

For example, a non-partner physician at Sound could earn up to $18,000 per year in RVU bonuses alone. A partner physician could earn up to or beyond $42,000 per year in RVU bonuses.

93.

After a physician becomes a junior partner, they are eligible for a higher bonus based on their RVUs, up to 50-60%. Dr. Haxhillari estimates that partner physicians typically earn about 20% of their overall compensation from productivity bonuses.

94.

According to Dr. Haxhillari, in order to meet the productivity bonus thresholds in the time allotted per shift, a physician would have to be billing F-3 level codes for almost every patient and seeing at least 8 patients per shift. This is not sustainable in the population at St. Patrick Hospital.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 21 -

95.

Physicians are eligible to become a senior partner after five years of employment with Sound. To qualify as a senior partner, a physician must complete modules on leadership and billing, as well as other courses that relate to the business of running a medical practice. A physician also has to meet criteria related to the time billed and pass a billing audit. After being named a senior partner, the physician is entitled to shares in the company as a senior partner.

96.

Most physicians at Sound only reach the junior partner level.

97.

Physicians at Sound are also compensated with a team bonus. This is an agreement between and hospital or health care organization that if the facility meets its designated metrics for a calendar year, all participating providers will receive a bonus. Dr. Haxhillari states that these bonuses are not large enough to motivate physicians to comply with the metrics, such as improving quality of patient care via reviews or meeting charting requirements. Essentially, the hospital metrics are geared toward increasing patient satisfaction. One distinct metric is the timing of patient discharges before noon.

98.

Sound physicians were consistently meeting the metrics during Dr. Haxhillari's tenure as Chief of the program, however, the performance slipped after he was removed as Chief.

**II. RVUs Incentivize Overbilling at Sound**

99.

Dr. Haxhillari observed systemic upcoding by abusing the "F" codes, which indicate the

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 22 -

complexity of the service, without the appropriate supporting documentation. To bill an F-code, a physician needs at least 30-40 minutes of face-to-face visit with a patient.

100.

Dr. Haxhillari noticed that physicians were entering an impossible amount of these codes. If physicians had actually spent the requisite amount of time as indicated by the codes, then the hours billed exceeded the number of hours in a day.

101.

Dr. Haxhillari also noticed that physicians were entering these higher complexity codes for up to 20 consecutive days during which the patients were not in need of such sustained advanced care. For example, many of the patients were simply waiting in the hospital until a room at a nursing facility opened up for them. This does not justify 20 days of advanced care billing.

102.

Dr. Haxhillari personally observed this conduct in the Lake Charles location but is aware this conduct occurs at all Sound locations nationwide.

A.    *Dr. Cody Tingle*

103.

Dr. Haxhillari first noticed the trend in coding distribution when looking at Dr. Cody Tingle's billing.

104.

Dr. Tingle became a partner at Sound in or around 2016. Prior to becoming a partner, Dr. Tingle was entering critical codes such as 99223 and 99233 around 30% of the time. After he

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 23 -

became a partner, Dr. Tingle was entering critical codes between 45-50% of his billing. His billing consisted of 40-45% of the critical code billing for the entire Sound team of eight physicians at the time.

105.

An internal review of Dr. Tingle's billing revealed that Dr. Tingle billed higher level codes at a drastically higher rate in 2016 and 2017 than he had in prior years when he was not a partner.

106.

Below is an excerpt of Dr. Tingle's critical care coding distribution from May 30, 2017.

| **Site Operations - Flash Report, Overview and Detail** | | | | | | | | |
| CHRISTUS St. Patrick Hospital<br>Tuesday, May 30, 2017 | | | | | | | | SOUND<br>PHYSICIANS |
| **Physician Level Data**<br>**A.1:  Critical Care Coding**<br>Distribution | Jan | Feb | Mar | Apr | 05/02<br>05/08 | 05/09<br>05/15 | 05/16<br>05/22 | 05/23<br>05/29 |
| **Tingle, Cody** | | | | | | | | |
| X-1 | 100.0% (25) | 100.0% (26) | 100.0% (41) | 100.0% (36) | 100.0% (7) | 100.0% (11) | 100.0% (15) | 100.0% (1) |
| X-2 | - | - | - | - | - | - | - | - |

107.

As a result of his billing practices, Dr. Tingle was eventually fired by Sound in 2018. However, his pattern of billing was modeled by other physicians at Sound and has led to systemic overbilling and upcoding as discussed in detail below.

108.

After leaving Sound, Dr. Tingle was subsequently terminated by St. Patrick Hospital for

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 24 -

fraudulent billing.

109.

Dr. Haxhillari identified the following partners as billing inappropriately: Dr. Lauren Jacoby, Dr. Thomas Kazecki, and Dr. Hung Nguyen.

B.      *Dr. Lauren Jacoby*

110.

Dr. Jacoby started working at Sound in 2017. She became eligible for RVU bonuses in or around 2018. After a year and a half, around 2019, she was promoted to junior partner.

111.

In the first year in which she was eligible for RVU bonuses, Dr. Jacoby's usage of critical care codes increased dramatically.

   a.   For example, in the code series 99221, 99222, and 99223 her usage of the highest code increased from 87% in 2017 to 100% in 2018. In 2019, her usage of 99223 was 91%

   b.   For example, in the code series 99218, 99219, and 99220 her usage of the highest code increased from 69% in 2017 to 100% in 2018. In 2019, her usage of 99220 remained 100% with a greater frequency of use.

   c.   For example, in the code series 99231, 99232, and 99233, her usage of the highest code increased from 66% in 2017 to 73% in 2018. In 2019, her usage of code 99233 was 65%, which is still higher than the national and state averages.

112.

Dr. Jacoby also billed the highest codes at a far greater rate than the National or

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 25 -

Louisiana averages for similarly situated providers.

    a.  In 2018 the national average for billing of 99223 was 59% and the Louisiana average was 59%. Dr Jacoby's percentage for the same code was 100%.

113.

During this time period there was no change in the patient population at St. Patrick Hospital or Sound.

114.

After reviewing several of her patient records, Dr. Haxhillari determined that Dr. Jacoby was not providing the critical level care for which she billed.

115.

As such, Dr. Haxhillari states that the only reason for the change in billing from mid-level to critical level codes was to increase Dr. Jacoby's RVU productivity bonus.

116.

Dr. Haxhillari never discussed Dr. Jacoby's change in billing codes with her directly. However, they did discuss the results of her billing audit, which was conducted by Sound.

117.

The billing audit randomly checks 10 billing charts to see if doctors are billing correctly. Usually, the score needed to pass an audit is 90%, meaning that a doctor is billing accurately 90% of the time.

118.

Dr. Jacoby received a score of 44% on her billing audit.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 26 -

119.

The audit information is circulated as a "Flash Report." Dr. Haxhillari reviewed these flash reports with Sound every month and would inform them which doctors had billing issues.

120.

Dr. Haxhillari brought up Dr. Jacoby's failed audit, as well as Dr. Kazecki's to both Dr. Fletcher and Jenkins. No disciplinary action was taken.

121.

Dr. Jacoby continued to bill inappropriately.

122.

For example, Patient 1 was admitted to the hospital for rehabilitation services on May 25, 2021. Dr. Jacoby saw Patient 1 on May 25, June 1, June 2, and June 3, 2021. At each of these evaluations, she did not order a single lab test, medication, or imaging for Patient 1. However, all visits were billed as moderate complexity. This is considered improper because the treatment plan for the patient did not change. The notes in the electronic records were simply copied and pasted from one visit to the next. This does not qualify as moderate care and moderate care is not supported by the concurrent clinical documentation by Dr. Jacoby.

123.

For example, Patient 2 was admitted to the hospital for observation on June 2, 2021. He was seen by Dr. Jacoby on June 2, June 3, and June 4, 2021. The notes indicate that Dr. Jacoby took no action to address the patient's symptoms on her first visit with Patient 2.

124.

On the second day of treatment, Dr. Jacoby billed for a high complexity visit despite only

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 27 -

giving Patient 2 blood. This does not qualify as critical care.

125.

In subsequent visits, the patient notes indicate there was minimal management of Patient 2's symptoms. There are no new complaints, and the only action taken is further transfusions. This is considered maintenance and does not justify the critical billing codes

C.    *Dr. Thomas Kazecki*

126.

Dr. Kazecki was eligible to become partner in the summer of 2019. If promoted, he would earn 50% of his RVU. When he was eligible for Partner, Dr. Haxhillari (in his capacity as program chief) did not recommend him for partnership because Dr. Kazecki failed the internal billing audit. The audit showed that Dr. Kazecki billed excessively high.

127.

Dr. Haxhillari reported to both Dr. Fletcher, the Regional Medical Director, and Jenkins, the Regional Finance Director, that Dr. Kazecki did not meet the criteria to be named a partner at Sound.

128.

After he failed the audit conducted by Dr. Haxhillari, Dr. Kazecki went around Dr. Haxhillari to Dr. Fletcher. Dr. Kazecki convinced Dr. Fletcher to allow the junior partnership promotion.

129.

Shortly thereafter, Dr. Haxhillari was asked to step down as the program chief, which meant he was no longer in charge of auditing physician billing.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 28 -

130.

In the year following his promotion to partner, Dr. Kazecki's critical level billing increased.

D.     *Dr. Hung Nguyen*

131.

Dr. Nguyen started working at Sound in 2014. He became a partner at Sound in or around 2017.

132.

During Dr. Haxhillari's tenure as program Chief, Dr. Nguyen failed all routine audits. Had he failed a subsequent audit he would have been in danger of termination.

133.

However, despite Dr. Haxhillari's protestations, Dr. Nguyen was promoted to partner in or around 2017.

134.

When reviewing CMS data for Dr. Nguyen, Dr. Nguyen use of higher-level codes changed drastically between 2016 and 2017.

a.  For example, for the subsequent hospital care codes, series 99231-99233, Dr. Nguyen billed nothing at the lowest level, 99231, in either year, but his use of 99232 decreased from 199 to 100 claims while his use of 99233 increased from 137 to 170 claims.

b.  For example, in 2016 Dr. Nguyen's billed 99232 59% of the time compared with 37% of the time in 2017. And in 2016 he billed 99233 41% of the time compared

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 29 -

with 63% of the time in 2017.

| CPT | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|
| | **Nguyen** | | | | | |
| | Freq. | % | Freq. | % | Freq. | % |
| 99221 | 15 | 4% | 0 | 0% | 0 | 0% |
| 99222 | 105 | 28% | 15 | 5% | 20 | 9% |
| 99223 | 254 | 68% | 276 | 95% | 202 | 91% |
| **Total** | **374** | | **291** | | **222** | |
| 99231 | 0 | 0% | 0 | 0% | 0 | 0% |
| 99232 | 199 | 59% | 100 | 37% | 191 | 62% |
| 99233 | 137 | 41% | 170 | 63% | 118 | 38% |
| **Total** | **336** | | **270** | | **309** | |
| 99218 | 0 | 0% | 0 | 0% | 0 | 0% |
| 99219 | 38 | 37% | 0 | 0% | 0 | 0% |
| 99220 | 64 | 63% | 69 | 100% | 75 | 100% |
| **Total** | **102** | | **69** | | **75** | |
| 99224 | 0 | - | 0 | - | 0 | - |
| 99225 | 0 | - | 0 | - | 0 | - |
| 99226 | 0 | - | 0 | - | 0 | - |
| **Total** | **0** | | **0** | | **0** | |

135.

For example, Patient 3 was admitted into the hospital for chest pains. In his initial visit, Dr. Nguyen billed 99220, which is a high complexity code. However, he ordered no medications and performed no other actions that would indicate a critical level of care provided.

E.      *Dr. Tarig Mabrouk*

136.

Dr. Mabrouk started working with Sound Physicians in the summer of 2020. He was hired by Dr. Jacoby.  He became eligible for RVU bonuses of up to 25% in January 2021.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 30 -

137.

Dr. Mabrouk became eligible for the first level in the partnership track in January 2021.

138.

Dr. Haxillari is aware that Dr. Mabrouk's billing of the highest level and critical codes increased upon eligibility for RVU bonuses.

139.

For example, Patient 4 was admitted to the hospital on June 2, 2021. Dr. Mabrouk completed a medical history and physical at that time. In the case management notes, Dr. Mabrouk states that he ordered steroids, an MRI, and carotid. However, the attached order does not include any of those medications or tests described in the case management notes. Further, the chart indicates Dr. Mabrouk only spent 17 minutes face-to-face with the patient.

140.

Dr. Mabrouk billed the highest complexity CPT code for the visit.

141.

This is improper because in order to bill critical care, a physician would have to spend at least 30 minutes or more on patient care.

142.

For example, Patient 5 was admitted with sepsis and an infected foot. Dr. Mabrouk properly treated the sepsis in his first visit. However, he continued to bill high complexity for follow up visits after the initial diagnosis.

143.

This is improper because the patient's prognosis improved, and Dr. Mabrouk never

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 31 -

ordered any new or different treatment to support continued high complexity billing.

F.    Dr. Mark Ulanja

144.

Dr. Ulanja started working at Sound in December 2019. He was hired by Dr. Jacoby. He was eligible for the first level of RVU bouses in April 2020.

145.

Dr. Ulanja became eligible for the partnership track in January 2021.

146.

Dr. Haxhillari is aware that Dr. Ulanja's billing of the highest level and critical codes increased upon eligibility for RVU bonuses.

147.

For example, Patient 6 was admitted to the hospital on June 18, 2021. The patient was initially seen by Dr. Mabrouk, who billed code 99223 despite not meeting the elements for that code.

148.

Dr. Ulanja then visited Patient 6 on June 19, June 20, and June 21, 2021. Dr. Ulanja billed code 99233 for all visits.

149.

However, the patient did not have a critical condition, did not present needing critical case, and the case management notes did not indicate that the criteria for billing 99233 were met.

150.

Further, Dr. Ulanja did not spend the requisite time with the patient to justify billing the

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 32 -

critical codes.

## III.    Dr. Haxhillari's contract is terminated

151.

Dr. Haxhillari was employed by Sound via a contractual agreement starting in March 2015. He received a W-2 from Sound. He received a baseline salary in addition to metric bonuses as described above.

152.

Dr. Haxhillari's contract was for an initial period of three years. This is typical at Sound. However, unless affirmative action is taken to terminate the employment contract, it automatically renews in three-year terms.

153.

 Dr. Haxhillari denied Dr. Kazecki a promotion based on a failed internal billing audit, consistent with Sound and CMS policy.

154.

This upset Dr. Kazecki, who went around Dr. Haxhillari to Dr. Fletcher to complain about Dr. Haxhillari's denial.

155.

Dr. Kazecki convinced Dr. Fletcher to promote him to junior partner despite the failed internal audit.

156.

Shortly thereafter, in October 2019, Dr. Fletcher demoted Dr. Haxhillari.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 33 -

157.

Dr. Haxhillari's demotion meeting occurred directly after a meeting with the administration of St. Patrick Hospital. Dr. Fletcher, Jenkins, and Dr. Haxhillari met with the CEO of the hospital. Sound was given a glowing review at the meeting.

158.

Dr. Fletcher, Jenkins, and Dr. Haxhillari were scheduled to go to dinner that evening. They ended up meeting in the cafeteria of the hospital that evening because Dr. Haxhillari was working the evening shift.

159.

During that meeting, Dr. Fletcher asked Dr. Haxhillari to step down from his position as Chief. He offered Dr. Haxhillari several months of severance and asked him to tell others that the decision to step down was voluntary.

160.

Dr. Haxhillari refused to say that he had voluntarily stepped down.

161.

Dr. Haxhillari asked for a reason for his demotion. Dr. Fletcher stated that the demotion was not related to Dr. Haxhillari's performance. Dr. Fletcher stated that there were complaints about Dr. Haxhillari as an individual without providing any examples or specifics regarding the supposed conduct.

162.

Dr. Fletcher also stated that it was the hospital that had requested Dr. Haxhillari step down.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 34 -

163.

However, when Dr. Haxhillari spoke with the Chief Medical Officer of the hospital, Dr.

Tim Haman, several days later, Dr. Haman stated that it was Sound that had requested his

demotion, not St. Patrick hospital.

164.

This conversation occurred in October 2020 and the demotion was effective November

11, 2020.

165.

After his demotion, Dr. Haxhillari was no longer the Chief of the program and was just

listed as a physician at Sound. He was replaced as Chief by Dr. Jacoby.

166.

Dr. Jacoby was appointed the interim program Chief despite having a failing score of

44% on her internal audit from 2019.

167.

Following his demotion, Dr. Haxhillari continued to observe the trend of physicians

coding for high levels of care. Based on the sample of patient records he reviewed in conjunction

with the productivity reports available to him, he saw that there was systemic upcoding and

abuse of the highest "F" codes without the appropriate supporting documentation.

168.

As stated above, the highest complexity codes were be used in almost every service

provided by partners and senior partners. These codes would require at least 40 minutes of face-

to-face contact with a patient. Based on the rates at which the physicians were entering the codes,

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 35 -

there was no way they could have spent that amount of time with their patients because their hours billed exceeded the number of hours in a day.

169.

Further, physicians were using complexity codes for up to 20 consecutive days during which patients were not in need of such advanced care. For example, when a patient was simply waiting for a bed to transfer to another facility.

170.

Due to the above concerns, Dr. Haxhillari raised his concerns with Dr. Fletcher and Jenkins. Specifically, he stated that physicians were routinely changing their billing practices after becoming junior partners and that based on his review of the patient notes, the coding was improper.

171.

Both Dr. Fletcher and Jenkins continued to brush off Dr. Haxhillari's concerns.

172.

Jenkins stated that it didn't matter what the physicians were doing as long as Sound was making money.

173.

After Dr. Haxhillari was demoted in late 2020, the team dynamic at Sound began to deteriorate from close knit to a group of individuals who barely spoke unless required for operation of the business.

174.

This was, in part, due to a restructuring at Sound under Dr. Jacoby and Dr. Kumar, the

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 36 -

Regional Director for Sound.

175.

Dr. Haxhillari attended a regional meeting with Lake Charles physicians and Dr. Kumar

in early 2021. Dr. Kumar stated that Lake Charles had become the least productive Sound

location. She indicated that the facility needed to be restructured and billing increased.

176.

Dr. Haxhillari questioned the new direction in this meeting, stating that the practice

should not be restructuring. During Dr. Haxhillari's tenure as Chief from 2015 to 2019, the

program was operating well and recovered over $60 million. This declined after his demotion.

177.

Dr. Haxhillari had excellent performance reviews throughout his tenure at Sound.

178.

In February 2021, Dr. Haxhillari received a phone call from Dr. Fletcher informing him

that Sound would be terminating his contract.

179.

When he asked why, Dr. Fletcher informed him that Sound was moving in a different

direction, and it did not comport with Dr. Haxhillari's opinions.

180.

Dr. Haxhillari was terminated from Sound effective June 25, 2021.

181.

Sound did not state any other reason for the decision to end its employment relationship

with Dr. Haxhillari.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 37 -

182.

Dr. Haxhillari believes he was terminated by Sound as a result of his complaints on the productivity trends by partner and senior partner physicians resulting in the fraudulent billing described in this complaint.

## COUNT I

**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**
**Against All Defendants**

183.

Dr. Haxhillari realleges and incorporates the allegations set forth above as though fully alleged herein.

184.

The False Claims Act imposes civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

185.

Defendants knowingly presented or caused to be presented false claims to CMS when they submitted claims for payment for upcoded services and requested a higher reimbursement rate than they were entitled to.

186.

The United States, unaware of the falsity of the claims made by Defendants, and in reliance on the accuracy thereof, paid Defendants for such false claims.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 38 -

187.

By reasons of the acts and conduct of Defendants in violation of 31 U.S.C. §
3729(a)(1)(A), the United States has suffered actual damages, including the total amounts paid in
response to all such false or fraudulent claims for payment.  In addition, the United States is
entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## COUNT II

**Retaliation against Relator Violation of the False Claims Act**
**31 U.S.C. § 3730(h)**
**Against Defendants Sound Physicians and Dr. Ray Fletcher**

188.

Dr. Haxhillari realleges and incorporates the allegations set forth above as though fully
alleged herein.

189.

Dr. Haxhillari was an "employee" and Sound is an "employer" as the terms are defined
by the False Claims Act.

190.

Defendants demoted and terminated Dr. Haxhillari, in part, because he voluntarily
performed lawful acts to investigate and stop one or more violations of the False Claims Act.

191.

Dr. Haxhillari engaged in protected activity when he denied Dr. Kazecki's promotion
based on his failed audit and when he raised concerns regarding the billing practices with
Fletcher and Jenkins.

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 39 -

192.

Defendant, knowing that Dr. Haxhillari was engaging in such activity, ended its relationship with Dr. Haxhillari.

193.

Temporal proximity between Dr. Haxhillari's disclosures and the termination of his contract is strongly suggestive of causation.

194.

To redress harms he suffered as a result of the acts and conduct of Defendants in violation of 31 U.S.C. § 3730(h), Relator is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress and any other damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, the Relator Dr. Arian Haxhillari, acting on behalf of and in the name of the United States of America, and on his own behalf, prays that judgment be entered against Defendants for violations of the False Claims Act:

(a)     That this Court enter judgment against the Defendants jointly and severally in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500.00 to $11,000.00 (or in such other amount as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 pursuant to 31 U.S.C. § 3729(a)(1)) for each action in violation of 31 U.S.C. § 3729(a), and the costs of

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 40 -

this action, with interest, including the costs to the United States Government for its expenses related to this action;

(b)    Dr. Haxhillari be awarded all costs incurred, plus reasonable attorneys' fees and expenses, in accord with 31 U.S.C. § 3730(d);

(c)    In favor of Relator Haxhillari for all compensatory and punitive damages, including personal injury damages for pain and suffering and loss of reputation, back pay, interest, and attorneys' fees and costs to which he is entitled pursuant to 31 U.S.C. § 3730(h);

(d)    That, in the event the Government elects to intervene in and proceed with this action, Dr. Haxhillari be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1);

(e)    That, in the event that the Government does not proceed with this action, Dr. Haxhillari be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2);

(f)    That, pursuant to 31 U.S.C. § 3730(c)(5), Dr. Haxhillari be awarded a share of any alternate remedy that the Government elects to pursue;

(g)    That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint;

(h)    That the Government and Dr. Haxhillari be awarded prejudgment and post-judgment interest;

(i)    That the Government and Dr. Haxhillari receive all relief, both at

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 41 -

law and in equity, to which they may be reasonably entitled; and

(j) For such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Dr. Arian Haxhillari

demands a jury trial.

Respectfully submitted,

*/s/ John H. Musser, V*
John H. Musser, V (#22545)
Murphy, Rogers, Sloss, Gambel & Tompkins
701 Poydras Street, Suite 400
New Orleans, Louisiana 70139
Phone: (504) 274-3840
Facsimile: (504) 523-5574
jmusser@mrsnola.com

*- and -*

R. Scott Oswald (*pro hac vice pending*)
Lydia A. Pappas (*pro hac vice pending*)
The Employment Law Group, P.C.
1717 K Street, N.W., Suite 1110
Washington, D.C. 20006
Phone: (202) 261-2822
Facsimile: (202) 261-2835
soswald@employmentlawgroup.com
lpappas@employmentlawgroup.com

*Counsel for Plaintiff-Relator Dr. Arian Haxhillari*

4839-0951-2958, v. 1

CONFIDENTIAL AND UNDER SEAL—*QUI TAM* COMPLAINT
*United States ex rel. Arian Haxhillari v. Sound Physicians, et al.*

- 42 -